# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **STATS, LLC, a Delaware limited liability company,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No.** |
| **PERFORM SPORTING NEWS (2), LLC, a Delaware limited liability company,** | ) ) ) | |
| **Defendant.** | ) ) | |

## COMPLAINT FOR
## DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff, STATS, LLC ("STATS"), by its attorneys, Golan & Christie LLP, as its Complaint for Declaratory Judgment and Other Relief against Defendant, Perform Sporting News (2), LLC ("Perform"), state as follows:

### NATURE OF CASE

1.      STATS and American City Business Journals d/b/a The Sporting News ("ACBJ") entered into a License Agreement ("LC") pursuant to which STATS provided statistical sports information for use by ACBJ on its various media outlets.  After performing their respective obligations for over two (2) years, ACBJ advised STATS that it would be selling its Sporting News division (the "ACBJ Transaction") and wished to assign the LC to Perform.  Such assignment required STATS written consent.

2.      STATS ultimately acquiesced to the assignment after receiving Perform's written confirmation that it had accepted the assignment from ACBJ and agreed to assume all of ACBJ's obligations under the LC. Upon accepting the assignment, Perform became the sole licensee under the LC.

3.     For over a year following the ACBJ Transaction, STATS and Perform performed their respective obligations pursuant to the terms of the LC.  In June of 2014, Perform advised STATS that it was terminating the LC based on the ACBJ Transaction.  Despite having previously accepted assignment of the LC from ACBJ, Perform maintained that the ACBJ Transaction warranted early termination of the LC based on the Change of Control Provision (defined below), which requires the sale of all or substantially all of the licensee's assets.

4.     Perform's attempted early termination of the LC is invalid.  After accepting the assignment, *only a subsequent Change of Control in Perform* would provide a basis for early termination, not the alleged Change of Control in ACBJ because ACBJ is no longer the licensee under the LC.  Moreover, even if Perform could rely upon the ACBJ Transaction, that transaction did not constitute the sale of all or substantially all of ACBJ's assets.  The Sporting News constituted only a small portion of ACBJ's business, which currently consists of over 1,600 employees and more than 40 publications and other media outlets.

5.     This Court should enter a declaratory judgment finding, among other things, that: (a) STATS accepted ACBJ's assignment of its rights under the LC to Perform; (b) Perform cannot rely upon the ACBJ Transaction as a basis for early termination of the LC; and (c) the LC remains a valid and enforceable contract.  Additionally, this Court should award STATS damages for all unpaid license fees that are currently due and owing pursuant to the LC.

## PARTIES

6.     STATS is a Delaware limited liability company with its principal place of business located at 2775 Shermer Road, Northbrook, Illinois 60062.  STATS is in the business of compiling, analyzing and marketing statistical sports information and related products.

7.     Perform is a Delaware limited liability company with its principal place of business located in New York, New York.  Perform is in the business of providing digital sports

content.

**JURISDICTION AND VENUE**

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000.00.

9.     Pursuant to the express language of the LC, venue is proper in this judicial district because the parties have consented to the exclusive jurisdiction of state and federal courts situated in Cook County, Illinois and waived any right to transfer to another venue.

**FACTS COMMON TO ALL COUNTS**

**I.     The License Agreement**

10.     On March 7, 2012, STATS entered into a License Agreement (the "License Agreement" or "LC") with American City Business Journals, Inc. d/b/a The Sporting News ("ACBJ"). A copy of the License Agreement is attached hereto as Exhibit 1.

11.     Pursuant to the License Agreement, ACBJ acquired the right from STATS to license and use certain proprietary information owned by STATS for use on ACBJ's web sites, smartphone and tablet applications, fantasy game applications, and in connection with its print magazine.

12.     The LC provides, in pertinent part, that:

(a)     the term of the LC shall be from the Effective Date[1] (January 1, 2012) through December 31, 2016 (*LC*, §3(a));

(b)     the licensee shall have a right to terminate the LC prior to its expiration provided that the licensee "has undergone a Change of Control" (*Id.* at §3(b));

(c)     in the event of an early termination pursuant to Section 3(b) of the LC, the licensee shall pay an "Early Termination Fee" equal to six (6) months of the then-prevailing Guaranteed Monthly License

---

[1] The defined terms herein shall have the same meaning ascribed to them in the License Agreement.

3

Fee, if the Early Termination Notice is delivered during Year Three or Year Four of the LC (*Id.*); and

(d)     the licensee shall pay STATS Guaranteed Monthly License Fees in the amounts of $101,430.00, $106,501.50 and $111,826.58, per month, during years 3 through 5 of the LC, respectively (*Id.* at §4(a)(iii) – (v)).

13.     Section 1(u) of the LC narrowly defines the term "Change of Control" as: "(i) the sale of all or substantially all of [l]icensee's assets to a third party, or (ii) the acquisition by a third party of more than 50% of the total voting power of [l]icensee, or (iii) [l]icensee's shareholders approve a complete liquidation or dissolution of the company" (the "Change of Control Provision").

14.     Section 18 of the LC further provides that "[n]either party may assign the LC without written consent, except that a party may assign the LC in connection with the sale of all or substantially all of its assets, provided that the assignee agrees to be bound by the terms of the LC" (*Id.* at §18) (the "Assignment Provision").

## II.     ACBJ's Assignment of the LC to Perform

15.     From January 1, 2012 through March 27, 2013, the parties performed their respective obligations in compliance with the terms of the LC.

16.     On March 27, 2013, ACBJ sent a letter to STATS stating that ACBJ was "contemplating the transfer of its Sporting News business division to a new joint venture," Perform, which would be owned entirely by ACBJ and Perform Media Channels Limited, as the two partners in the joint venture (the "March 27, 2013 Letter"). ACBJ purported to exercise its right to assign its obligations to Perform pursuant to the Assignment Provision of the LC. A copy of the March 27, 2013 Letter is attached hereto as Exhibit 2.

17.     On May 8, 2013, pursuant to STATS' request, Perform sent a letter to STATS confirming that Perform "agrees to be bound by all of the terms and conditions of the [LC]" (the "May 8, 2013 Letter").  A copy of the May 8, 2013 Letter is attached hereto as Exhibit 3.

18.     From March 27, 2013 through June 20, 2014, Perform acted as the licensee under the LC and performed all of the licensee's obligations thereunder.

**III.     Perform's Invalid Attempt to Terminate the LC**

19.     On June 20, 2014, following a conference call between the parties, Perform sent a draft letter to STATS stating that the ACBJ Transaction constituted a Change of Control event that warranted early termination pursuant to Section 3(b) of the LC (the "July 20, 2014 Draft Letter").  A copy of the June 20, 2014 Draft Letter is attached hereto as Exhibit 4.

20.     On June 23, 2014, STATS rejected Perform's invalid attempt to exercise an early termination.

21.     On July 11, 2014, Perform sent a second letter to STATS stating that it "has elected to exercise its right to terminate the [LC] which arose by virtue of the Change of Control event which occurred between [ACBJ] and Perform and pursuant to clause 3(b)" of the LC (the "July 11, 2014 Letter").  A copy of the July 11, 2014 Letter is attached hereto as Exhibit 5.

22.     Pursuant to Section 3(b) of the LC, Perform enclosed a check with the July 11, 2014 Letter made payable to STATS, representing the Early Termination Fee equal to six (6) months of the then-prevailing Guaranteed Monthly License Fee, in the amount of $608,580.00 (the "Early Termination Check").  This amount represents six (6) months of Guaranteed Monthly License Fees in the amount of $101,430.00 each.

23.     On July 22, 2014, STATS sent another letter rejecting Perform's invalid attempt to exercise an early termination pursuant to Section 3(b) of the LC (the "July 22, 2014 Letter").  STATS has held, but has not deposited, the Early Termination Check enclosed with the July 22,

2014 Letter. Copies of the July 22, 2014 Letter and the Early Termination Check are attached hereto as Exhibit 6.

24.     STATS rejected Perform's attempt to terminate the LC because: (i) Perform accepted assignment of the LC and performed the licensee's obligations for over a year, and therefore cannot rely upon the ACBJ Transaction as a basis for early termination of the LC; and (ii) even if Perform could rely upon the ACBJ Transaction, ACBJ did not sell all or substantially all of its assets to Perform, and therefore a Change of Control event under the LC has not occurred.

## COUNT I
### Declaratory Judgment – Assignment to Perform

25.     STATS realleges and incorporates paragraphs 1 through 24 as though fully stated herein.

26.     At the time of and due to the ACBJ Transaction, ACBJ elected to assign its rights and obligations under the LC to Perform.

27.     Perform accepted assignment of the LC.

28.     Perform met the licensee's obligations under the LC for over a year prior to its attempted termination of the LC.

29.     Perform has no basis to terminate the LC.

30.     The LC remains in full force and effect.

31.     STATS has an inadequate remedy at law.

32.     STATS is entitled to recover its attorneys' fees and costs incurred in enforcing its rights under the LC. (*LC*, §20(a).)

33.     As a result of the above and foregoing, there is an actual case in controversy between STATS and Perform pursuant to 735 ILCS 5/2-701.

WHEREFORE, Plaintiff, STATS, LLC, prays that this Honorable Court:

A. Enter a Declaratory Judgment in favor of STATS, LLC and against Perform Sporting News (2), LLC finding that:

    i. American City Business Journals, Inc. d/b/a The Sporting News assigned its rights under the License Agreement to Perform;

    ii. Perform accepted assignment of the LC and assumed all obligations thereunder;

    iii. Perform has no basis to terminate the LC; and

    iv. the LC remains a valid and enforceable contract between STATS and Perform.

B. Enter judgment in favor of STATS, LLC and against Perform Sporting News (2), LLC in the amount of the attorneys' fees and costs incurred by STATS in enforcing its rights under the LC; and

C. Award such other and further relief as this Court deems just.

**COUNT II**
**Breach of Contract**

34. STATS realleges and incorporates paragraphs 1 through 33 as though fully stated herein.

35. The LC is a valid and enforceable contract between STATS and Perform.

36. Perform has breached the LC by failing to pay the Guaranteed Monthly License Fee due and owing to STATS for August of 2014.

37. STATS has fully performed its obligations under the LC.

38. STATS has and will continue to sustain damages for each month that Perform fails to pay the Guaranteed Monthly License Fee due and owing to STATS pursuant to the LC.

WHEREFORE, Plaintiff, STATS, LLC, prays that this Court enter judgment in its favor and against Perform Sporting News (2), LLC, in an amount in excess of $75,000.00 to be determined at trial, plus attorneys' fees and costs, and grant such further relief as this Court deems just and appropriate.

## COUNT III
## <u>Declaratory Judgment</u>
## (In the Alternative)

39.     STATS realleges and incorporates paragraphs 1 through 24 as though fully stated herein.

40.     Assuming, *arguendo*, that this Court finds that Perform properly terminated the LC based on a Change of Control event, Section 3(b) of the LC requires that Perform pay STATS "a fee (the 'Early Termination Fee'), due and payable at the time of delivery of the Early Termination Notice, in an amount equal to … (bb) six (6) months of the then-prevailing Guaranteed Monthly License Fee, if the Early Termination Notice is delivered during Year Three or Year Four." (*LC*, §3(b).)

41.     Perform's July 11, 2014 Letter purports to be an Early Termination Notice under the LC.

42.     The July 11, 2014 Letter included an Early Termination Check equal to six (6) months of the prevailing Guaranteed Monthly License Fee in the amount of $101,430.00 per month.

43.     Assuming, *arguendo*, that the July 11, 2014 Letter is construed as an effective early termination of the LC, STATS is entitled to retain and deposit the Early Termination Check.

44.     STATS has an inadequate remedy at law.

45.     As a result of the above and foregoing, there is an actual case in controversy between STATS and Perform pursuant to 735 ILCS 5/2-701.

WHEREFORE, Plaintiff, STATS, LLC, prays that this Honorable Court:

A.     in the event that this Court finds that Perform Sporting News (2), LLC properly terminated the LC, enter a Declaratory Judgment in favor of STATS, LLC and against Perform Sporting News (2), LLC finding that:

      i.     STATS is entitled to retain and deposit the Early Termination Check tendered by Perform on July 11, 2014 in the amount of $608,580.00; or

      ii.    alternatively, Perform is required to tender an Early Termination Fee to STATS in an amount equal to six (6) months of Guaranteed Monthly License Fees in the amount of $101,430.00 each, totaling $608,580.00;

B.    Enter judgment in favor of STATS, LLC and against Perform Sporting News (2), LLC in the amount of the attorneys' fees and costs incurred by STATS in enforcing its rights under the LC; and

C.    Award such other and further relief as this Court deems just.

Dated: August 7, 2014

STATS, LLC,

By:    /s/ Matthew C. Wasserman
          One of their Attorneys

Margaret A. Gisch, Esq. (ARDC# 6204431)
Matthew C. Wasserman, Esq. (ARDC# 6287638)
Anita J. Pancholi, Esq. (ARDC# 6311288)
GOLAN & CHRISTIE LLP
70 West Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300

# EXHIBIT 1

C-1081

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "**Agreement**") is made and entered into this 7th day of March 2012, by and between STATS LLC, a Delaware limited liability company ("**STATS**"), and American City Business Journals, Inc., d/b/a The Sporting News, a Delaware corporation ("**Licensee**").

### W I T N E S S E T H :

WHEREAS, STATS is in the business of compiling, analyzing and marketing sports statistical information and related products; and

WHEREAS, Licensee is currently in the business of, among other things, developing and marketing World Wide Web sites on the Internet, smartphone and tablet applications, mobile web sites, fantasy game applications and a print magazine; and

WHEREAS, Licensee desires to acquire from STATS the right and license to use certain of STATS' proprietary information for use on Licensee's World Wide Web sites, mobile web sites, smartphones and tablet applications, fantasy game applications and in connection with its print magazine, and STATS is willing to grant such a license to Licensee, upon the terms and conditions hereinafter provided.

NOW, THEREFORE, in consideration of the foregoing recitals, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. <u>Definitions</u>. As used herein, the following terms shall have the following meanings:

   (a) "**Applications**" shall mean all solely branded Sporting News applications in all media and platforms currently existing or hereafter developed, including but not limited to: (i) smartphone applications, (ii) mobile web sites, (iii) tablet applications, and (iv) social media applications within which the Licensed Materials – Content Feed will be displayed and made available to users via all devices.

   (b) "**Effective Date**" shall mean January 1, 2012.

   (c) "**Fantasy Applications**" shall mean, collectively, the Fantasy Applications – Licensee Branded and the Fantasy Applications – White Label.

   (d) "**Fantasy Application – Licensee Branded**" shall mean the Sporting News-branded fantasy sports game applications developed, operated, maintained and solely branded by Licensee, within which the Licensed Materials – Content Feed will be distributed on the Sites to Non-Commercial Users.

   (e) "**Fantasy Applications - White Label**" shall mean the third party- branded fantasy sports game applications developed, operated and maintained by Licensee, within which the

License Agreement
Confidential
/#280957 v1

Page 1 of 34

Licensee's Initials

Licensed Materials – Content Feed will be distributed on third party sites to Non-Commercial Users.

(f) "**Licensed Materials**" shall mean, collectively, the Licensed Materials – Content Feed and the Licensed Materials – STATS PASS®, attached hereto and licensed to Licensee pursuant to paragraph 2(a) of this Agreement. In the event that Licensee properly exercises any of its Options, then the applicable Optional Licensed Materials (described in Exhibit A-3) shall also be deemed to be Licensed Materials.

(g) "**Licensed Materials – Content Feed**" shall mean the proprietary data and information described on Exhibit A-1, attached hereto and licensed to Licensee pursuant to paragraph 2(a) of this Agreement.

(h) "**Licensed Materials – STATS PASS®**" shall mean the proprietary data and information described on Exhibit A-2, attached hereto and licensed to Licensee pursuant to paragraph 2(a) of this Agreement.

(i) "**Non-Commercial Users**" shall mean all recipients (whether or not such recipients are paying subscription fees) who use the Licensed Materials solely for non-commercial purposes and shall specifically exclude, without limitation, consumers that would reasonably be expected to have a commercial or business use for the Licensed Materials, such as professional sports teams, professional sports leagues, agents and republishers (book publishers, magazines, television, radio, etc.).

(j) "**Site(s)**" shall mean the World Wide Web and Internet site(s) developed, marketed and solely branded by Licensee, within which the Licensed Materials-Content Feed will be distributed on the Sites or within the Fantasy Applications – Licensee Branded on the Sites at any URL addresses owned, operated and solely-branded by Licensee, including but not limited to: http://www.sportingnews.com, as well as any fee-based portions of the Sites (http://www.xxx.sportingnews.com or http://www.sportingnews.com/xxx).

(k) "**STATS PASS®**" shall mean STATS' proprietary online research product, which includes player and team statistics, leaders, scores, scouting reports, etc.

(l) "**Subscribers**" shall mean Licensee's customers who register to access (i) the tablet applications that contain AP-attributed portions of the Licensed Materials – Content Feed via tablet devices, and/or (ii) the smartphone applications that contain AP-attributed portions of the Licensed Materials – Content Feed via mobile devices.

(m) "**Term**" shall have the meaning set forth in paragraph 3 hereof.

(n) "**Third Party Developer(s)**", if applicable, shall mean an entity (or entities), other than Licensee, who have been retained by Licensee to perform development services on behalf of Licensee in connection with the rights granted to Licensee herein, and will, in the course of such development work, have access to any portion of the Licensed Materials.

(o) "**Widgets**" shall mean web-based widgets, solely branded by Sporting News, that contain a limited portion of the statistical portions of the Licensed Materials – Content Feed only and link back to the statistical portion of the Licensed Materials -- Content Feed on the Sites. Licensee may pull and display the Widgets on third party websites and on social media sites to promote the availability of the Fantasy Applications – Licensee Branded and Licensed Materials – Content Feed on the Sites.

(p) "**Year One**" shall mean January 1, 2012 through and including December 31, 2012.

(q) "**Year Two**" shall mean January 1, 2013 through and including December 31, 2013.

(r) "**Year Three**" shall mean January 1, 2014 through and including December 31, 2014.

(s) "**Year Four**" shall mean January 1, 2015 through and including December 31, 2015.

(t) "**Year Five**" shall mean January 1, 2016 through and including December 31, 2016.

(u) "Change of Control" shall mean the occurrence of any of the following: (i) the sale of all or substantially all of Licensee's assets to a third party, or (ii) the acquisition by a third party of more than 50% of the total voting power of Licensee, or (ii) Licensee's shareholders approve a complete liquidation or dissolution of the company.

It is also acknowledged and agreed that the Applications, the Fantasy Application – Licensee Branded, the Site(s) and/or the Widgets may carry incidental AOL branding acknowledging Licensee's license and presentation of selected AOL content. Notwithstanding anything herein to the contrary, such incidental AOL branding shall not cause the Applications, the Fantasy Application – Licensee Branded, the Site(s) and/or the Widgets to be deemed as co-branded.

2. License and Limitations.

(a) Non-Exclusive License. STATS hereby grants to Licensee a non-exclusive license as follows:

(i) to reproduce, market, distribute and display (i) the Licensed Materials – Content Feed on the Sites and within the Fantasy Applications for Non-Commercial Users of the Sites (for Fantasy Applications – Licensee Branded) and for Non-Commercial Users on third party web sites (for Fantasy Applications – White Label) upon proper notice to STATS, and (ii) the statistical portion of the Licensed Materials – Content Feed (or portions thereof) within Widgets, for news-related purposes to Non-Commercial Users of the web sites and social media web sites worldwide during the Term; and

(ii) to reproduce, market, distribute and display the Licensed Materials – Content Feed within the Applications for news-related purposes to users and Subscribers (as applicable) worldwide during the Term; and

License Agreement
Confidential
/#280957 v1

Page 3 of 34

Licensee's Initials

(iii) to utilize the Licensed Materials-STATS PASS® in the normal course of business strictly for purposes of internal analysis and research in connection with articles to be published in Licensee's print magazine during the Term, provided that Licensee shall not publish, redistribute, incorporate or display in their entirety any tables, charts, reports, or leaderboards which are contained within or generated by the STATS PASS® product. In addition, subject to Section 10(b), Licensee shall be permitted to display on the Sites and/or within Applications, or in other formats (such as .pdf or microfilm), verbatim full or partial reproductions of articles originally printed in Licensee's print magazine during the Term which contain any portion of the Licensed Materials – STATS PASS®.

(b) <u>Limitations</u>.  The license granted by STATS to Licensee in paragraph 2(a) above shall be strictly limited to the terms of the grants contained in such paragraphs and no additional rights or licenses shall be construed or implied thereby. Licensee shall not reproduce, use, distribute or display the Licensed Materials on the Sites, within the Applications, or within the Fantasy Applications or within Widgets in any manner that may allow for the Licensed Materials to be downloaded, copied or retransmitted. In addition, the Licensed Materials shall not be combined or displayed in conjunction with any material or service which is obscene, pornographic, defamatory, or otherwise illegal, or in conjunction with an advertisement for any product or service that is obscene, pornographic, defamatory or otherwise illegal, or is disparaging of any sports league. Notwithstanding the foregoing, Licensee shall not be restricted with respect to editorial or opinion content relating to a sports league. The Licensed Materials shall not be used in widgets (other than as expressly permitted herein) or in an RSS or similar type of feed, and AP- and Getty- attributed photographs shall not be used in a "photo-gallery." Licensee shall not translate, edit, modify, prepare derivative works of, or otherwise alter the Licensed Materials. Licensee shall not build archival files using the Licensed Materials, or any portion thereof, and no individual component of the AP- or Getty-attributed portions of Licensed Materials, or the entire AP- or Getty-attributed portion of the Licensed Materials, will be held in Licensee's computers or stored in another medium for more than fourteen (14) days. Upon receipt from STATS or Associated Press of a "kill," "elimination," "withheld," or "correction" directive, Licensee will promptly process such directive, and, if applicable, replace affected material and notify users of the changed status of the affected material. Such replacement or notification shall be conspicuous. Licensee shall not display any material from the Licensed Materials which is slugged or otherwise identified as "on-line out" or "not for publication."  Licensee shall comply with all use restrictions/instructions which accompany any photo provided under this Agreement.  STATS' ability to license the Licensed Materials to any other parties shall in no way be limited by this Agreement.  Notwithstanding the foregoing, with respect to Licensee's use of AP-attributed photos, if Licensee has a separate agreement with the Associated Press that grants it the right to utilize the AP-attributed photos in a manner that would otherwise be restricted or prohibited hereunder, then that agreement and the rights granted therein shall govern Licensee's use of AP-attributed photos and shall override the limitation contained in this paragraph 2(b) for as long as Licensee's agreement with the Associated Press grants the applicable rights.  Further, for as long as Licensee maintains any such separate agreement with the Associated Press relating to Licensee's use of AP-attributed photos, Licensee shall not be obligated to comply with paragraph 4(b) below, and the provisions of paragraph 4(c) below shall not apply.

(c) Sublicenses/Syndication, Etc. Licensee shall have no right to sublicense, co-brand, co-market, white label, distribute, syndicate, or in any other manner, make the Licensed Materials available, directly or indirectly, through any means other than as explicitly set forth in this Agreement without the express written permission of STATS.

(d) Unauthorized Use. Any use of the Licensed Materials that is inconsistent with this Agreement shall be considered an Unauthorized Use. Licensee shall make reasonable efforts to monitor subscriber and Third Party Developer use, and adopt commercially reasonable safeguards intended to prevent the Unauthorized Use of the Licensed Materials. In the event that either party to this Agreement becomes aware that any third party or Third Party Developer is improperly using the Licensed Materials or is about to improperly use the Licensed Materials, including, without limitation, providing or about to provide any Licensed Materials to business or commercial users, such party shall immediately notify the other party of the facts of which it is aware in connection with such actual or potential Unauthorized Use and shall provide the other party with any documents in its possession with respect to same. The parties shall cooperate, at their own expense, to the fullest extent possible and agree to take all actions reasonably necessary, including, without limitation, initiating legal proceedings, to eliminate such Unauthorized Use as expeditiously as possible. Licensee shall indemnify and hold STATS harmless from and against any and all costs and expenses, including, without limitation, attorneys' fees and costs, in connection with the actual or potential Unauthorized Use of the Licensed Materials as the result of Licensee or any Third Party Developer's negligence, gross negligence or willful misconduct.

(e) STATS maintains back-up systems designed to make commercially reasonable efforts to ensure that the Licensed Materials are complete and accurate at the time provided to Licensee. STATS shall not be deemed in breach of this Agreement in the event that it is unable to provide any portion(s) of the Licensed Materials as the direct result of the cancellation of any sporting event(s) or sports league(s). In the event of an outage which results from a failure of the data provided by a sports league or any other third party, STATS shall use its best efforts to provide substantially similar content within a commercially reasonable time frame.

(f) NFL Data: In the event that Licensee disseminates NFL data that does not conform to the Use Restrictions (as set forth in Exhibit B-1 attached hereto), STATS shall provide written notice to Licensee of such non-compliance (the "**Grid Non-Compliance Notice**"). The Grid Non-Compliance Notice shall specify that Licensee shall have five (5) days (the "**Grid Non-Compliance Cure Period**"), after receipt of notice, to either: (i) comply with the Grid Restrictions, or, (ii) provide STATS with a written statement certifying that no data supplied by STATS that is not compliant with the Grid Restrictions is used in the NFL data disseminated by Licensee and indicate the alternative source of such data. If after the Grid Non-Compliance Cure Period has expired Licensee has not complied with the foregoing, STATS shall cease to provide NFL real-time data to Licensee until such time as appropriate compliance can be ensured to the reasonable satisfaction of STATS.

(g) NBA Data. With respect to all NBA-related content, the license granted by STATS to Licensee pursuant to this Agreement shall be subject to the Terms and Conditions set forth on Exhibit B-2, attached hereto.

License Agreement
Confidential
/#280957 v1

Page 5 of 34

Licensee's Initials

(h) MLB Data. With respect to all Major League Baseball data (the "**MLBAM Data**"), the license granted by STATS to Licensee pursuant to this Agreement shall be subject to the Terms and Conditions set forth on Exhibit B-3, attached hereto.

(i) Optional Licensed Materials. During the Term, Licensee shall have the option (each, an "Option") to elect to receive certain one-time event content (the "**Optional Licensed Materials**," as described in Exhibit A-3). In order to properly elect such Option, Licensee must (i) provide STATS with thirty (30) days written notice of its intent to exercise the Option, and (ii) pay STATS the relevant fee (each, a "**One Time Event License Fee**"), as set forth in paragraph 4(e) hereto.

3. Term.

(a) The term of this Agreement shall commence on the Effective Date and shall terminate on December 31, 2016 (the "**Term**"), unless sooner terminated as provided in this Agreement. Except as expressly set forth in subsection (b), below, under no circumstance shall Licensee's failure to use the Licensed Materials affect the start or duration of the Term, or any of Licensee's payment obligations set forth herein.

(b) Notwithstanding the foregoing, Licensee shall have the right to terminate this Agreement prior to the expiration of the Term, provided Licensee: (i) is not in breach of this Agreement or no event has occurred that would constitute a breach of the Agreement, and (ii) Licensee provides thirty (30) days written notice to STATS (the "**Early Termination Notice**"), and (iii) has ceased publishing or disseminating all sports-oriented content on all available platform(s) for the balance of the Term OR has undergone a Change of Control, and (iv) pays to STATS a fee (the "**Early Termination Fee**"), due and payable at the time of delivery of the Early Termination Notice, in an amount equal to (aa) twelve months of the then-prevailing Guaranteed Monthly License Fee, if the Early Termination Notice is delivered during Year One or Year Two, or (bb) six (6) months of the then-prevailing Guaranteed Monthly License Fee, if the Early Termination Notice is delivered during Year Three or Year Four, or (cc) three (3) months of the then-prevailing Guaranteed Monthly License Fee, if the Early Termination Notice is delivered during Year Five. In the event that Licensee properly exercises the Early Termination Option, this Agreement shall be deemed to terminate at 11:59pm prevailing Eastern Time on the thirtieth (30th) day after STATS receives the Early Termination Notice and Early Termination Fee from Licensee (the "**Early Termination Date**"), or other such later date as specified in the Early Termination Notice, and, except where otherwise specifically stated, neither party shall have any obligation to the other after the Early Termination Date. For the avoidance of doubt, during the period of time after STATS receives the Early Termination Notice through the Early Termination Date, Licensee shall continue to pay the Guaranteed Monthly License Fee to STATS, and STATS shall continue to deliver the Licensed Materials to Licensee.

4. Fees and Payments.

(a) Licensing Fee. In consideration of the right and license to be provided by STATS to Licensee pursuant to paragraph 2(a) of this Agreement, during the Term, Licensee shall pay a

total license fee (the "**Total License Fee**") to STATS in the amount of Six Million One Hundred Thousand Two Hundred Ninety Six Dollars and Ninety Six Cents ($6,100,296.96), subject to Licensee's early termination of this Agreement in accordance with paragraph 3(b). Notwithstanding the foregoing, the Total License Fee shall be payable by Licensee to STATS in monthly installments. Commencing upon the Effective Date and continuing on the first day of each succeeding month during the Term, Licensee hereby agrees to make monthly payments to STATS for each month of the Term (the "**Guaranteed Monthly License Fee**") as follows:

(i) During Year One of the Term, Licensee shall pay to STATS a Guaranteed Monthly License Fee in the amount of Ninety Two Thousand Dollars ($92,000.00) per month.

(ii) During Year Two of the Term, Licensee shall pay to STATS a Guaranteed Monthly License Fee in the amount of Ninety Six Thousand Six Hundred Dollars ($96,600.00) per month.

(iii) During Year Three of the Term, Licensee shall pay to STATS a Guaranteed Monthly License Fee in the amount of One Hundred One Thousand Four Hundred Thirty Dollars ($101,430.00) per month.

(iv) During Year Four of the Term, Licensee shall pay to STATS a Guaranteed Monthly License Fee in the amount of One Hundred Six Thousand Five Hundred One Dollars and Fifty Cents ($106,501.50) per month.

(v) During Year Five of the Term, Licensee shall pay to STATS a Guaranteed Monthly License Fee in the amount of One Hundred Eleven Thousand Eight Hundred Twenty Six Dollars and Fifty Eight Cents ($111,826.58) per month.

(b) Licensee's Reporting Requirements. During the Term, and continuing for sixty (60) days thereafter, Licensee shall forward to STATS, within thirty (30) days after the end of each month, monthly statements specifying the number of downloads and the number of Subscribers for each of the Tablet Applications and iPhone Applications that contain AP-attributed portions of the Licensed Materials.

(c) Books and Records.

(aa) Licensee shall maintain separate accounts and records at its principal place of business for revenues generated pursuant to this Agreement as are necessary for the determination of all amounts due STATS under this Agreement, or shall maintain an accounting that is sufficient to facilitate the determination of the amounts due under this Agreement.

(bb) STATS shall also have the right to hire an independent auditor to inspect Licensee's records and books of account for the purpose of verifying the amount of sums due STATS hereunder. STATS shall give Licensee no less than twenty (20) business days advance written notice of any audit. Such auditor shall not disclose to STATS or any third party the contents of the Licensee's books and records other than the information necessary to determine whether Licensee has paid all amounts due to STATS pursuant to this Agreement. If such audit reflects that Licensee has underpaid STATS any amounts due hereunder by five percent (5%) or more, Licensee shall bear the cost of such audit. Any underpaid amounts shall be immediately

due and payable to STATS and shall bear interest at the rate of ten percent (10%) per annum from the date such amounts should have been paid to STATS.

(d) License Fee Fantasy Application – White Label. If at any time during the Term, upon thirty (30) days written notice to STATS, Licensee builds Fantasy Applications - White Label , then Licensee shall pay to STATS a one-time fee for each such Fantasy Application – White Label (the "Fantasy Application – White Label Fee"), as follows:

(i) During Year One, Licensee shall pay to STATS a fee in the amount of Fifteen Thousand Dollars ($15,000.00) for each Fantasy Application – White Label.

(ii) During Year Two, Licensee shall pay to STATS a fee in the amount of Fifteen Thousand Seven Hundred Fifty Dollars ($15,750.00) for each Fantasy Application – White Label.

(iii) During Year Three, Licensee shall pay to STATS a fee in the amount of Sixteen Thousand Five Hundred Thirty Seven Dollars and Fifty Cents ($16,537.50) for each Fantasy Application – White Label.

(iv) During Year Four, Licensee shall pay to STATS a fee in the amount of Seventeen Thousand Three Hundred Sixty Four Dollars and Thirty Eight Cents ($17,364.38) for each Fantasy Application – White Label.

(v) During Year Five, Licensee shall pay to STATS a fee in the amount of Eighteen Thousand Two Hundred Thirty Two Dollars and Sixty Cents ($18,232.60) for each Fantasy Application – White Label.

*Each Fantasy Application – White Label Fee, as applicable, shall be due and payable to STATS concurrently with Licensee's written notice of its intention to build each such Fantasy Application – White Label.

(e) Reporting. Licensee shall forward to STATS, within thirty (30) days after the end of each NBA season, a statement setting forth the number of registered users, on a monthly basis, of any NBA-oriented Fantasy Application.

(f) License Fees - Optional Licensed Materials. If at any time during the Term, Licensee properly elects its Option to receive any Optional Licensed Materials, then Licensee shall pay to STATS a One Time Event License Fee (per event), due and payable upon Licensee's election of the relevant Option, as follows:

(i) Summer 2012 and 2016 Olympics: Fifty Thousand Dollars ($50,000.00) per each Summer Olympics event.
(ii) Winter 2014 Olympics: Fifty Thousand Dollars ($50,000.00).
(iii) 2014 FIFA World Cup: Twenty Thousand Dollars ($20,000.00).

(g) All fees set forth herein are net of any applicable taxes or transfer fees.

(h) <u>Late Payments</u>. Any late payments shall bear interest at the rate per annum equal to the lesser of (i) ten percent (10%) or (ii) the highest rate permitted under applicable law.

5. <u>Transfer of the Licensed Materials</u>. The parties agree that they shall use their best efforts to cooperate with each other and provide each other with technical assistance in connection with the transfer to Licensee of the Licensed Materials. Licensee shall be solely responsible for all direct costs in connection with its receipt of the Licensed Materials from STATS. STATS shall provide the Licensed Materials in accordance with the Service Level Agreement attached hereto as Exhibit D. In the event STATS ceases to provide material portions of the Licensed Materials – Content Feed outlined in Exhibits A-1 and A-2 (or A-3 if applicable) during the Term, the Guaranteed Monthly License Fee shall be pro-rated accordingly.

6. <u>Trademarks, Trade Names and Related Matters</u>.

(a) <u>STATS Name and Trademarks</u>. STATS hereby grants to Licensee a non-exclusive, worldwide license to use STATS' name and logo in connection with the reproduction, distribution and display of the statistical portion of the Licensed Materials and the STATS-attributed editorial portions of the Licensed Materials on the Sites, within the Applications and Fantasy Applications and within Widgets. Licensee acknowledges STATS' ownership of STATS' name and logo and agrees that any use thereof shall inure to STATS' benefit; that the use thereof shall conform to standards and specifications initially or presently approved by STATS; and to cooperate with STATS in facilitating STATS' control of such usage by supplying to STATS as STATS shall reasonably request, no less than quarterly, specimens of such usage. STATS shall notify Licensee of any failure by Licensee to conform such usage to the standards set forth herein, and Licensee shall have thirty (30) days from receipt of such notice to cure such failure to STATS' approval, such approval not to be unreasonably withheld. If STATS is not satisfied that such failure has been timely cured, and/or upon termination or expiration of this Agreement, Licensee shall cease all use of STATS' name, logo and trademarks.

(b) <u>AP Name and Trademarks</u>. STATS hereby grants to Licensee a non-exclusive, worldwide license to use AP's name and logo in connection with the AP-attributed editorial portions of the Licensed Materials on the Sites within the Applications (as applicable) and Fantasy Applications. Licensee acknowledges AP's ownership of AP's name and logo and agrees that any use thereof in connection with the AP-attributed editorial portions of the Licensed Materials shall inure to AP's benefit; that the use thereof in connection with the AP-attributed editorial portions of the Licensed Materials shall conform to standards and specifications initially or presently approved by STATS; and to cooperate with STATS in facilitating STATS' control of such usage by supplying to STATS as STATS shall reasonably request, no less than quarterly, specimens of such usage. STATS shall notify Licensee of any failure by Licensee to conform such usage to the standards set forth herein, and Licensee shall have thirty (30) days from receipt of such notice to cure such failure to STATS' approval, such approval not to be unreasonably withheld. If STATS does not approve that such failure has

been timely cured, and/or upon termination or expiration of this license, Licensee shall cease all use of AP's name, logo and trademarks.

(c) _Licensee's Name and Trademarks_. Licensee hereby grants to STATS a non-exclusive worldwide license to use Licensee's name, logo, and trademarks in connection with STATS' ordinary course of promotional, marketing and press release activities. Each actual use of Licensee's name, logo and/or trademarks by STATS is subject to the prior approval of Licensee. All rights to Licensee's name, logo and trademarks are owned by Licensee, and STATS shall assert no rights, title or interest therein or thereto. All goodwill from Licensee's name, logo and/or trademarks shall inure to the sole benefit of Licensee.

(d) _STATS and AP Logos_. Licensee shall display the STATS logo attached hereto as Exhibit C on all pages/screens of the Sites, within the Applications, Fantasy Applications and Widgets in conjunction with any marketing material that may introduce and/or display the statistical portions of Licensed Materials and the STATS-attributed editorial portions of the Licensed Materials. In addition, Licensee shall also display the AP logo attached hereto as Exhibit C, or will otherwise credit AP in a mutually agreed upon manner, on any page of the Site and within the Applications, as applicable, and Fantasy Applications which displays the AP-attributed editorial portions of the Licensed Materials. The size and placement of the STATS and AP logos shall be mutually agreed upon by the parties before such use commences. STATS' logo shall be clickable to the following URL: www.stats.com.

(e) _Copyright Notice._
(i) With respect to the statistical portions of the Licensed Materials, Licensee agrees to display the following copyright notice in connection with all uses of these portions of the Licensed Materials (including on all pages/screens of the Sites, Applications and Fantasy Applications (with respect to the Licensed Materials – Content Feed), and within the print publication (with respect to Licensed Materials – STATS PASS® only) and Widgets that display or use such portions of the Licensed Materials, or any portion thereof, in any manner): "Copyright xxxx [where xxxx denotes the current year] by STATS LLC. Any commercial use or distribution without the express written consent of STATS LLC is strictly prohibited."

(ii) With respect to the textual portions of the Licensed Materials – Content Feed and non-NBA photographs, Licensee agrees to display the following copyright notice in connection with all uses of these portions of the Licensed Materials – Content Feed (including on all pages/screens of the Sites, within the Applications (as applicable) and Fantasy Applications that display or use these portions of the Licensed Materials – Content Feed in any manner): "Copyright xxxx [where xxxx denotes the current year] by STATS LLC and Associated Press. Any commercial use or distribution without the express written consent of STATS LLC and Associated Press is strictly prohibited."

(iii) With respect to NBA photographs, Licensee agrees to display the following copyright notice in connection with all uses of these portions of the Licensed Materials – Content Feed (including on all pages/screens of the Sites, within the Applications and Fantasy Applications that display or use these portions of the Licensed Materials – Content Feed in any manner): "Copyright xxxx [where xxxx denotes the current year] Getty Images."

License Agreement
Confidential
/#280957 v1

Page 10 of 34

Licensee's Initials

(iv) With respect to the MLBAM Data, Licensee agrees to display, on pages/screens of the Sites, within the Applications and Fantasy Applications that display or use the MLBAM Data in any manner, the attribution set for in Exhibit B-3.

(f) Credits. Licensee shall also display the credit or attribution provided by STATS with respect to each item, or portions thereof, of the editorial portions of the Licensed Materials – Content Feed used on the Sites, within the Applications and Fantasy Applications, which will be substantially in the form of:

(i) For text: [Writer's byline], STATS Writer; or [Writer's byline], Associated Press Writer; or (AP) or By The Associated Press, [Writer's byline].

(ii) For non-NBA photos: Visual representation of "AP" logo on picture or immediately below adding AP Photo/[Photographer's byline].

(iii) For NBA photos: Photo by [Photographer's byline]/NBAE via Getty Images; or Photo by [Photographer's byline]/Getty Images.

7. Representations and Warranties.

(a) By STATS.

(i) STATS represents and warrants that it has full power and authority to enter into this Agreement and to consummate the transactions contemplated herein, and that it shall act in accordance with all applicable laws in performing its obligations and exercising its rights under this Agreement;

(ii) STATS represents and warrants that it has all necessary right, title and/or license to the Licensed Materials (including but not limited to any AP materials that may comprise any portion of the Licensed Materials), and that the Licensed Materials shall not infringe upon the intellectual property rights or any other proprietary rights of any third party; and

(iii) STATS represents and warrants that it has participated with, at its option, the advice and benefit of counsel, in the preparation of this Agreement.

(iv) STATS represents and warrants that the parties have jointly prepared and/or approved the language of the provisions of this Agreement and that should any dispute arise concerning the interpretation of any provision hereof, neither party shall be deemed the drafter nor shall any such language be presumptively construed in favor of or against either party.

(b) By Licensee:

(i) Licensee represents and warrants that it has full power and authority to enter into this Agreement and to consummate the transactions contemplated herein, and that it shall act in accordance with all applicable laws in performing its obligations and exercising its rights under this Agreement;

(ii) Licensee represents and warrants to STATS that Licensee shall be solely responsible for obtaining any third-party licenses as may be required in connection with Licensee's use of the Licensed Materials herein, including, but not limited to, marketing, advertising and promotional activities; and

(iii) Licensee represents and warrants that it has participated with, at its option, the advice and benefit of counsel, in the preparation of this Agreement.

(iv) Licensee represents and warrants that the parties have jointly prepared and/or approved the language of the provisions of this Agreement and that should any dispute arise

concerning the interpretation of any provision hereof, neither party shall be deemed the drafter nor shall any such language be presumptively construed in favor of or against either party.

8. <u>Disclaimer of Implied Warranties.</u> EXCEPT AS PROVIDED HEREIN, STATS DISCLAIMS ALL WARRANTIES WITH RESPECT TO ITS WORK UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

9. <u>Termination of Agreement</u>. This Agreement may be terminated:

(a) by STATS, immediately, in the event of a repeated Unauthorized Use of the Licensed Materials by Licensee or any Third Party Developer. Notwithstanding the foregoing, (i) upon the first instance of an Unauthorized Use of the Licensed Materials by Licensee, any Third Party Developer or third party (in connection with a Fantasy Application – White Label, as applicable, STATS shall have the right to immediately halt the delivery of the Licensed Materials to Licensee, and Licensee shall then have three (3) business days in which to cure said Unauthorized Use of the Licensed Materials, and upon said cure, the delivery of the Licensed Materials to Licensee shall resume, but STATS shall have the right to terminate this Agreement in the event that such Unauthorized Use is not cured within said three (3) business days; and (ii) upon the second instance of an Unauthorized Use of the Licensed Materials by Licensee or any Third Party Developer STATS shall have the right to immediately terminate this Agreement;

(b) by STATS, fourteen (14) days following the failure of Licensee to make any payment hereunder when due and such payment is not made during said fourteen (14)-day period;

(c) by either party, thirty (30) days following written notice of a breach by the other party of any provision of this Agreement (other than with respect to Unauthorized Use and payment obligations, as set forth in subparagraphs (a) and (b), above) if such breach is not cured within said thirty (30)-day period, or if such breach is not susceptible to cure within thirty (30) days, the breaching party fails to make commercially reasonable efforts to commence the cure of such breach within said thirty (30)-day period and to diligently proceed to cure such breach within ninety (90) days after the written notice;

(d) by either party, immediately following written notice that a receiver has been appointed for the other party of its property (and the appointment of such receiver is not terminated), the other party has become insolvent or unable to pay its debts as they mature, the other party has made an assignment for benefit of creditors or any proceedings have been commenced by or against the other party under any bankruptcy, insolvency or other similar law (and such proceedings are not dismissed within sixty (60) days following commencement thereof); or

(e) by Licensee, in accordance with Paragraph 3(b).

10. <u>Obligations Upon Termination</u>.

License Agreement           Page 12 of 34
Confidential
/#280957 v1

Licensee's Initials

(a) <u>Post-Termination Payments</u>. The termination of this Agreement shall not relieve Licensee of its obligations to account for and pay to STATS any sums due hereunder. In addition, if this Agreement is terminated as a result of Licensee's failure to pay any fees set forth herein after receipt of written notice of such failure from STATS, any and all fees and payments shall accelerate and become immediately due and payable in full to STATS.

(b) <u>Additional Post-Termination Obligations</u>.

(i) Following the expiration of the Term of this Agreement or the earlier termination of the Agreement for any reason, each party shall return to the other or shall destroy all documents, material and information with respect to any confidential or proprietary information of the other (in any format as such information may exist), including, without limitation, Licensee and any Third Party Developer, if applicable, shall return to STATS or destroy the Licensed Materials, and shall ensure that its Third Party Developer has similarly returned or destroyed the Licensed Materials. Immediately upon destruction of any confidential or proprietary information, Licensee shall provide STATS with an affidavit signed by an officer or legal representative of Licensee denoting the documents, materials and information destroyed, the manner of destruction, and the date of the destruction. Notwithstanding the foregoing, following the expiration of the Term, provided STATS has not previously terminated this Agreement due to an uncured breach by the Licensee, and further provided that Licensee is not in breach of this Agreement or no event has occurred that would constitute a breach of the Agreement, Licensee shall have the option to retain the previously-delivered (e.g. during the Term) STATS-attributed portions of the Licensed Materials – Content Feed, only, and to continue to display such STATS-attributed portions of the Licensed Materials – Content Feed on Sporting News' historical indexed pages of the Sites (where such content already resides) on a perpetual basis (the "**Perpetual License**"), subject to Licensee's payments to STATS of the Annual Perpetual License Fee as detailed in Paragraph 10(b)(ii) and 10(b)(iii), below. Notwithstanding the foregoing and for purposes of clarity, once the links to the historical indexed pages of the Sites disappear or are no longer active, Licensee shall be obligated to return to STATS or destroy such portions of the Licensed Materials – Content Feed. In addition, following the expiration of the Term, Licensee shall be permitted to retain and utilize those articles which were published in Licensee's print magazine in the ordinary course of its business activities during the Term of this Agreement and which contain or incorporate some portion of the Licensed Materials – STATS PASS®, but shall take reasonable measures to ensure that said materials are not used in contravention of the terms of this Agreement. However, Licensee shall not have the right to archive, database or store in any other fashion, the Licensed Materials – STATS PASS®. Upon such expiration or termination, each party shall cease any and all use, reproduction, marketing, and distribution of the trademarks, trade names, service marks, patents or other intellectual and personal property of the other.

(ii) In consideration of the Perpetual License set forth in Paragraph 10(b)(i) above, Licensee shall pay to STATS the annual fee (the "**Annual Perpetual License Fee**") as follows due to STATS on January 1st of each such year following the expiration of the Term.

(aa) <u>Post-Term Year One</u> (January 1, 2017 through December 31, 2017) Licensee shall pay to STATS an Annual Perpetual License Fee in the amount of Two Hundred

Sixty Eight Thousand Three Hundred Eighty Three Dollars and Seventy Eight Cents ($268,383.78).

(bb) Post-Term Year Two (January 1, 2018 through December 31, 2018) Licensee shall pay to STATS an Annual Perpetual License Fee in the amount of Two Hundred One Thousand Two Hundred Eighty Seven Dollars and Eighty Three Cents ($201,287.83).

(cc) Post Term Year Three (January 1, 2019 through December 31, 2019) and each year (January 1 through December 31) thereafter, payable annually, Licensee shall pay to STATS an Annual Perpetual License Fee in the amount of One Hundred Thirty Four Thousand One Hundred Ninety One Dollars and Eighty Nine Cents ($134,191.89).

(iii) Notwithstanding paragraphs 10(b)(i) and 10(b)(ii) above, Licensee shall have the option to terminate the Perpetual License following the conclusion of Post-Term Year One upon written notice to STATS no less than thirty (30) days prior to the conclusion of the then-current Post-Term Year, and provided that Licensee has paid, in full, the Annual Perpetual License Fee applicable to the then-current Post-Term Year and all prior Post-Term Year(s). In the event that Licensee properly elects to terminate the Perpetual License, then such termination shall take effect at 11:59 p.m. prevailing Eastern Time on December 31 of the then-current Post-Term Year, and accordingly, the Perpetual License granted in paragraph 10(b) above shall expire at 11:59 p.m. prevailing Eastern Time on December 31 of the then-current Post-Term Year, and Licensee shall immediately return to STATS, or destroy, the portions of the Licensed Materials – Content Feed which had been previously retained pursuant to the Perpetual License.

11. Confidential Information. The parties agree that during and after the Term they shall not, except for purposes of this Agreement, use for their own benefit or for the benefit of any person, firm, corporation or other entity, any secret or confidential information, solicitation methods, confidential pricing information or any other data pertaining to their respective businesses, or any affiliates thereof, their respective financial affairs or any other information obtained hereunder regarding each other not generally known within their respective trades, or as a matter of public knowledge or patent, trademark, trade name, service mark, copyright or other intellectual property of the other (collectively, the **"Confidential Information"**) except as authorized by this Agreement. Licensee agrees that it shall take reasonable steps to ensure that its employees and agents and any Third Party Developer, if applicable, do not communicate, grant, disburse or transmit in any way whatsoever to any third party or parties the Licensed Materials or the Confidential Information without the prior written consent of STATS, except as explicitly permitted pursuant to this Agreement.

12. Force Majeure. Neither of the parties shall be deemed in default of this Agreement to the extent that performance of its respective obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, fire, natural disaster, accident, act of government, shortage of materials or supplies, act of terror, act of third parties, or any other case beyond the reasonable control of such party, provided that the party interfered with gives the other party written notice thereof within ten (10) business days of any such event or occurrence.

Licensee's Initials

13. Hold Harmless.

(a) By STATS. STATS hereby agrees to defend, indemnify, save and hold harmless Licensee, its shareholders, directors, officers, employees, agents, successors, assigns and other representatives from and against any and all claims, liability, loss, damage, cost and expense (including reasonable attorneys' fees and litigation costs), arising out of or relating to (i) STATS' negligent or willful misconduct, or (ii) any breach or default by STATS of any representation, warranty, duty or obligation contained in this Agreement or any Attachment or Exhibit hereto.

(b) By Licensee. Licensee hereby agrees to defend, indemnify, save and hold harmless STATS, its shareholders, directors, officers, employees, agents, successors, assigns and other representatives from and against any and all claims, liability, loss, damage, cost and expense (including reasonable attorneys' fees and litigation costs), arising out of or relating to (i) Licensee's negligent or willful misconduct, or (ii) any breach or default by Licensee of any representation, warranty, duty or obligation contained in this Agreement or any Attachment or Exhibit hereto, or (iii) any negligent or willful misconduct of Licensee's Third Party Developer, or any other conduct of Licensee's Third Party Developer which is in violation of any of the terms of this Agreement.

(c) Insurance. STATS and Licensee shall each maintain appropriate errors and omissions or equivalent professional liability insurance in customary amounts sufficient to cover its indemnification obligations hereunder.

14. Limitation of Liability. Notwithstanding anything herein to the contrary, under no circumstances shall either party be liable to the other party for any special, consequential or incidental damages in connection with its obligations under this Agreement, and in any event, with the exception of indemnification claims or claims for payment of fees, the liability of either party for any act of negligence or breach of this Agreement shall not exceed One Million Dollars ($1,000,000.00).

15. Equitable Remedies. In the event of any breach of the provisions of Paragraph 11 hereof, the parties hereto agree that remedies at law may not be adequate and each shall be entitled, in addition to damages, to seek preliminary and permanent injunctive relief (without the necessity of posting of bond) to prevent a then occurring or an about to occur breach, as well as an equitable accounting of all profits or benefits arising out of such breach, which rights and remedies shall be cumulative and in addition to any other rights or remedies to which the parties may be entitled.

16. Notices. All notices and other communications required hereunder shall be in writing and deemed to have been given: (i) when personally delivered, (ii) three days after being mailed by certified mail, return receipt requested, postage prepaid, (iii) one day after being sent by nationally recognized overnight courier with guaranteed next day delivery, or (iv) upon delivery by facsimile, with copy via certified mail, return receipt requested, postage prepaid, to the addresses and facsimile numbers shown below:

License Agreement
Confidential
/ #280957 v1

Page 15 of 34

Licensee's Initials

| If to STATS: | with a copy to: |
|---|---|
| STATS LLC | STATS LLC |
| 2775 Shermer Road | 2775 Shermer Road |
| Northbrook, IL 60062 | Northbrook, IL 60062 |
| Attn: Gary Walrath | Attn: Legal Department |
| Fax: (847) 583-2650 | Fax: (847) 583-2649 |

| If to Licensee: | with a copy to: |
|---|---|
| The Sporting News | Sabin, Bermant & Gould LLP |
| 120 W. Morehead Street | 4 Times Square, 23rd Floor |
| Charlotte, NC 28202 | New York, NY 10036-6526 |
| Attn: Jeff Price | Attn: Michael Anderson |
| Fax: (704) 973-1595 | Fax: (212) 381-7201 |

Either party may, from time to time, change its address or facsimile number set forth above by providing written notice to the other party of any such changes.

17. Relationship Created. The relationship of the parties herein shall be as independent contractors. Nothing in this Agreement or any Attachment hereto shall be construed to create a partnership, joint venture or combined entity by or between STATS and Licensee or to make either the agent of the other and neither shall have the authority to bind the other. STATS and Licensee each agree not to hold itself out as a partner, joint venturer, combined entity or agent of the other. Each party is, and is intended to be, engaged in its own and entirely separate business. Each party shall be solely responsible for determining the applicability of, and compliance with, any and all present and future federal, state and local laws, orders, codes, regulations, and ordinances which may be applicable to each party and their respective businesses and employees.

18. Assignment. Neither party shall assign this Agreement or any of the rights, duties or privileges contained herein, in whole or in part, without the express written consent of the other, except that a party may assign this Agreement in connection with the sale of all or substantially all of its assets, provided that the assignee agrees to be bound by all of the terms and conditions of this Agreement.

19. Press Release. Within thirty (30) days after the Effective Date of this Agreement, the parties may separately or mutually issue a press release containing language agreed upon by the parties announcing that the parties have entered into a business relationship as contemplated herein. The content of any such press release is subject to the prior reasonable approval of both parties.

20. Miscellaneous.

(a) Choice of Law, Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to its conflict of laws

principles. The parties hereto irrevocably agree that all actions or proceedings in any way, manner, or respect, arising out of or from or related to this Agreement shall be litigated only in courts having situs within Cook County, Illinois. Each party hereby consents and submits to the exclusive jurisdiction of any local, state or federal court located within Cook County, Illinois and waives any right such party may have to transfer the venue of any such litigation. Each party waives any right to trial by jury on any action or proceeding to enforce or defend any rights under this Agreement. The prevailing party or parties in any such litigation shall be entitled to recover from the other party all costs and expenses, including without limitation reasonable attorneys' and paralegals' fees incurred by such party in connection with such litigation.

(b) Non-Waiver. The waiver by a party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent or additional breach.

(c) Entire Agreement; Construction. This Agreement supersedes any and all other agreements and understandings heretofore existing between the parties with respect to the subject matter hereof. This Agreement contains the entire agreement of the parties concerning the subject matter hereof and may be amended, modified, or changed only by an agreement in writing signed by each of the parties. For the avoidance of doubt, all terms and conditions set forth in any purchase order sent to STATS by Licensee shall be deemed null and void, irrespective of whether such purchase order was sent to STATS before or after the execution of this Agreement. In addition, the parties have jointly prepared and/or approved the language of the provisions of this Agreement and should any dispute arise concerning the interpretation of any provision hereof, neither party shall be deemed the drafter nor shall any such language be presumptively construed in favor of or against either party. The headings in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement.

(d) Severability. The provisions of this Agreement shall be severable, and the invalidity of any provision shall not affect the validity of the other provisions.

(e) Survival. Paragraphs 2(d), 4(b), 7, 8, 10, 11, 13, 14, 15, 16, and 20, and any other provision necessary for the interpretation thereof or which by its terms is to continue beyond the expiration or termination of this Agreement, shall survive the expiration or termination of this Agreement.

(Remainder of page intentionally left blank)

(f) <u>Execution</u>. This Agreement may be executed in multiple counterparts, including, but not limited to execution by facsimile, each of which shall be deemed an original, but all of which shall constitute the same document. Each party waives any legal requirement that this Agreement be embodied, stored or reproduced in tangible media, and agrees that an electronic reproduction will be given the same legal force and effect as a signed writing.

ACCEPTED AND AGREED:

**American City Business Journals, Inc.,**          STATS LLC
**d/b/a the Sporting News**

By: _Jeffrey S Price_                               By: Gary Walrath

Its: _President / Publisher_                        Its: CEO

Signature: _____                         Signature: _____

Date: _4/6/2012_                                    Date: _12 April 2012_

**EXHIBIT A-1**
**Licensed Materials – Content Feed**

<u>Data</u>:
**NBA:**
- In-Progress boxscores for all regular season, All-Star and postseason games, updated as events occur (approximately every 10 - 20 seconds during games)
- In-Progress play-by-play for all regular season, All-Star and postseason games, updated as events occur (approximately every 10 - 20 seconds during games)
- Final boxscores for all regular season, All-Star and postseason games, updated after game completion.
- Current season schedules
- Current season-to-date regular season player statistics
- Current team rosters
- Current season transactions
- Current season injuries
- Current team standings
- Current season-to-date regular season player splits
- Stat corrections from prior day
- Current Top Headlines, updated every 30 minutes
- Previews for each regular season, All-Star and postseason game
- Recaps for each regular season, All-Star and postseason game
- Current stories, updated as news warrants
- Current photos
- Current audio
- Career regular season and post-season year-by-year stats for all active players
- Career regular season and post-season year-by-year splits for all active players
- Odds information, updated as they are posted
- In-progress boxscore for preseason games (between NBA teams), updated as events occur (approximately every 10 – 20 seconds during games)
- Final boxscores for preseason games (between NBA teams), updated after each game completion
- Schedule and results for preseason

**NHL:**
- In-Progress boxscores for all regular season, All-Star and postseason games, updated as events occur (approximately every 10 - 20 seconds during games)
- In-Progress play-by-play for all regular season, All-Star and postseason games, updated as events occur (approximately every 10 - 20 seconds during games)
- Final boxscores for all regular season, All-Star and postseason games, updated after game completion.
- Current season schedules
- Current season-to-date regular season player statistics
- Current team rosters
- Current season transactions
- Current season injuries
- Current team standings
- Current season-to-date regular season player splits
- Current Top Headlines, updated every 30 minutes
- Previews for each regular season, All-Star and postseason game

License Agreement                    Page 19 of 34
Confidential
/#280957 v1                                                   Licensee's Initials

- Recaps for each regular season, All-Star and postseason game
- Stat corrections from prior day
- Current stories, updated as news warrants
- Current photos
- Current audio
- Career regular season and post-season year-by-year stats for all active players
- Career regular season and post-season year-by-year splits for all active players
- Odds information, updated as they are posted
- In-progress boxscore for preseason games (between NHL teams), updated as events occur (approximately every 10 – 20 seconds during games)
  Final boxscores for preseason games (between NHL teams), updated after each game completion
  Schedule and results for preseason

MLB:
- In-Progress boxscores for all regular season, All-Star and postseason games, updated as events occur (approximately every 10 - 20 seconds during games)
- In-Progress play-by-play for all regular season, All-Star and postseason games, updated as events occur (approximately every 10 - 20 seconds during games)
- Final boxscores for all regular season, All-Star and postseason games, updated after game completion.
- Current season schedules for regular season and postseason
- Current season-to-date regular season player statistics
- Current team rosters
- Current season transactions
- Current season injuries
- Current team standings
- Current season-to-date regular season player splits
- Current Top Headlines, updated every 30 minutes
- Previews for each regular season, All-Star and postseason game
- Recaps for each regular season, All-Star and postseason game
- Stat corrections from prior day
- Current stories, updated as news warrants
- Current photos
- Current audio
- Career regular season and post-season year-by-year stats for all active players
- Career regular season and post-season year-by-year splits for all active players
- Odds information, updated as they are posted
- In-progress score updates for non-charity spring training games, updated after each inning
- Final boxscore for non-charity spring training games, updated after each game completion
- Schedule and results for spring training

NFL:
- In-Progress boxscores for all regular season, postseason and Pro Bowl games, updated as events occur (approximately every 10 - 20 seconds during games)
- In-Progress play-by-play for all regular season, postseason and Pro Bowl games, updated as events occur (approximately every 10 - 20 seconds during games)
- Final boxscores for all regular season, postseason and Pro Bowl games updated after game completion.
- Current season schedules

- Current season-to-date regular season player statistics
- Current team rosters
- Current season transactions
- Current season injuries
- Current team standings
- Current season-to-date regular season player splits
- Current Top Headlines, updated every 30 minutes
- Previews for each regular season, All-Star and postseason game
- Recaps for each regular season, All-Star and postseason game
- Stat corrections from prior day
- Current stories, updated as news warrants
- Current photos
- Current audio
- Career regular season and post-season year-by-year stats for all active players
- Career regular season and post-season year-by-year splits for all active players
- Odds information, updated as they are posted
- In-progress boxscore for preseason games, updated as events occur (approximately every 10 – 20 seconds during games)
- Final boxscores for preseason games, updated after each game completion
- Schedule and results for preseason

MLS:
- Current season schedules
- Current season-to-date regular season player statistics
- Current team rosters
- Current season transactions
- Current season injuries
- Current team standings
- Current season-to-date regular season player splits
- Previews for each regular season, All-Star and postseason game
- Recaps for each regular season, All-Star and postseason game
- Current stories, updated as news warrants
- Current photos
- Career regular season and post-season year-by-year stats for all active players
- Career regular season and post-season year-by-year splits for all active players

**NCAA Division I College Football:**
- In-Progress boxscores for all games involving a team from the AP Top 25, ACC, Big 12, Big East, Big Ten, Conf USA, Notre Dame, Pac-12, SEC and all FBS bowl games, updated approximately every 30 seconds during games.
- In-Progress play-by-play for all games involving a team from the AP Top 25, ACC, Big 12, Big East, Big Ten, Conf USA, Notre Dame, Pac-12, SEC and all FBS bowl games, updated approximately every 30 seconds during games.
- Final boxscores for all non-exhibition games updated after game completion.
- Current season schedules
- Current season-to-date regular season player statistics
- Current team rosters
- Current team standings
- Current Top Headlines, updated every 30 minutes

- Previews for each Top 25 and FBS bowl game
- Recaps for each non-exhibition game
- Current stories, updated as news warrants
- Current photos
- Current audio
- Career year-by-year stats for all active players
- Odds information, updated as they are posted

**NCAA Division I Men's College Basketball:**
- In-Progress boxscores for all games involving a team from the AP Top 25, ACC, Big 12, Big East, Big Ten, Conf USA, Pac-12, SEC and all NCAA Final 64 tournament games, updated approximately every 30 seconds during games.
- In-Progress play-by-play for all games involving a team from the AP Top 25, ACC, Big 12, Big East, Big Ten, Conf USA, Pac-12, SEC and all NCAA Final 64 tournament games, updated approximately every 30 seconds during games.
- Final boxscores for all non-exhibition games updated after game completion.
- Current poll information
- Current season schedules
- Current season-to-date regular season player statistics
- Current team rosters
- Current team standings
- Current Top Headlines, updated every 30 minutes
- Previews for each Top 25 and NCAA tournament game
- Recaps for each non-exhibition game
- Current stories, updated as news warrants
- Current photos
- Current audio
- Career year-by-year stats for all active players
- Odds information, updated as they are posted
- NCAA Tournament bracket

**NCAA Division I Women's College Basketball:**
- In-progress score updates, updated 8-12 times per game
- Final boxscores for all non-exhibition games updated after game completion.
- Current poll information
- Current season schedules
- Current season-to-date regular season player statistics
- Current team rosters
- Current team standings
- NCAA Tournament bracket

**PGA Golf:**
- Full field updates approximately every 20 minutes for each non-exhibition tournament
- Post round results updated after round completion
- Current season schedules
- Current season-to-date regular season golfer statistics
- Current golfer information
- Current standings
- Current Top Headlines, updated every 30 minutes
- Current stories, updated as news warrants
- Current photos

- Current audio
- Career year-by-year stats for all active players

**NASCAR Cup Series:**
- Full field updates approximately every 10 minutes for each non-exhibition race
- Post race results updated after race completion
- Current season schedules
- Current season-to-date regular season driver statistics
- Current driver information
- Current driver standings
- Current Top Headlines for all motor sports, updated every 30 minutes
- Current stories, updated as news warrants
- Current photos
- Current audio
- Career year-by-year stats for all active drivers

**Tennis (ATP and WTA Singles)**
- In-progress score updates, updated approximately every 30 minutes
- Results for each tournament, updated at end of tournament day
- Schedule and results
- Rankings
- Current top headlines, updated every 30 minutes
- Current stories, updated as news warrants
- Current photos

Format:   XML for data and stories.  Photos in JPEG with maximum width of 512 pixels.

Delivery Method:   FTP to Licensee, unless otherwise noted.  Photos and audio delivered via NNTP.

Frequency:  Data updated once per day, unless otherwise noted.

Initial Delivery:  within ten (10) business days after the Effective Date.

**EXHIBIT A-2**
**Licensed Materials – STATS PASS®**

Two (2) STATS PASS® user accounts to access STATS LLC's STATS PASS® on-line product for MLB, NFL, NBA, CBK and CFB.

Service Period: Effective Date through and including December 31, 2016.

License Agreement
Confidential

Licensee's Initials

**EXHIBIT A-3**
**Optional Licensed Materials**

**I. Optional Content**

**A. 2014 FIFA Men's World Cup Finals**
- In-Progress boxscores for all games, updated approximately every minute during games
- Final boxscores for all games
- Current season schedules
- Current season-to-date regular season player statistics
- Current team rosters
- Current team standings
- Current stories, updated as news warrants
- Current photos

**B. Summer 2012 and 2016 Olympics**
- Top Headlines
- Current stories
- Current photos
- Participants, schedules and results for each event
- Medal standings

**C. Winter 2014 Olympics**
- Top Headlines
- Current stories
- Current photos
- Participants, schedules and results for each event
- Medal standings

**II. Format**: XML for data and stories. Photos in JPEG with maximum width of 512 pixels

**III. Delivery Method**: FTP to Licensee, unless otherwise noted. Photos and audio delivered via NNTP.

**IV. Frequency**: Data updated once per day, unless otherwise noted.

**V. Initial Delivery**: Upon commencement of the relevant event.

<u>Exhibit B-1</u>
NFL Use Restrictions

Display and dissemination of the licensed materials covering the NFL shall be limited as follows:

*Real-time Data Feed Restrictions for NFL Game Day Data*

|  | Anytime | Five (5) Minute Intervals | Change of Possession or End of Drive | After Quarter | End of Game | End of NFL Broadcast Day |
|---|---|---|---|---|---|---|
| *Score* | x | x | x | x | x | x |
| *Most recent Scoring Play* | x | x | x | x | x | x |
| *Time Remaining* | x | x | x | x | x | x |
| *Record Setting Individual & Team Achievements* | x | x | x | x | x | x |
| *Down/Distance* | x | x | x | x | x | x |
| *Ball Position* | x | x | x | x | x | x |
| *List of Scoring Plays* | x | x | x | x | x | x |
| *Team Stats* | x | x | x | x | x | x |
| *Individual Stats* | x | x | x | x | x | x |
| *Box Score* | x | x | x | x | x | x |
| *Key Plays* |  |  | x | x | x | x |
| *Drive Chart* |  |  | x | x | x | x |
| *Play-by-Play* |  |  | x | x | x | x |

"x" denotes when the data may be displayed as part of the television application, internet, and/or other service.

Any use of the above game data on television within an application used for purposes of video simulation of an NFL game by entities other than the NFL's television broadcast partners while any NFL game is in progress must be approved in writing by NFL.

Play-by-Play shall mean the chronological listing of the actions taken in each play of the game.

License Agreement
Confidential
/ #280957 v1

Page 26 of 34

Licensee's Initials

## EXHIBIT B-2
### NBA Terms & Conditions

With respect to the NBA portion of the Licensed Materials the "NBA Data") licensed under this Agreement, Licensee agrees to comply with the following additional Terms and Conditions:

1.   Licensee shall not use or refer to any sponsor or commercial identification in connection with the NBA Data, or any portion thereof, (e.g., "NBA scores brought to you by [sponsor]" or "[sponsor's] NBA Update") however, Licensee may accept third-party advertising on pages on which NBA Data is presented;

2.   Licensee shall not use or refer to the NBA Data (or any portion thereof) in connection with, or in combination with, any illegal activity including without limitation, illegal gambling, and shall not use or refer to the NBA Data (or any portion thereof) in connection with, or in combination with, a legal gambling activity unless the NBA Data is used together with in-progress data from at least two other major sports (including the NFL);

3.   Licensee shall not use or refer to the NBA Data (or any portion thereof) in connection with, or in combination with:

(i) any multi-sport paid or subscription service, unless such service treats equitably all major sports included in the service (e.g. a situation where users are charged a fee to view the NBA Data but not NFL-related content is prohibited), or such service has been licensed separately by NBA Media Ventures, LLC ("NBAMV") or one of its affiliates; or

(ii) any NBA-only paid or subscription service, unless such service has been licensed separately by NBAMV or one of its affiliates;

4.   Licensee shall not use the NBA Data in connection with, or in combination with, any electronic trading cards, unless such electronic trading cards have been licensed separately by NBAMV or one of its affiliates, and Licensee acknowledges that the distribution of the NBA Data in connection with the Fantasy Applications has been authorized by NBAMV and is without prejudice to, and will have no bearing on, whether or not a license is required under law for any future use of NBA Information in connection with, or combination with, any fantasy game or application;

5.   Licensee shall not use the NBA Data in connection with, or in combination with, any product or service that utilizes NBA/WNBA/D-League marks, logos, player likenesses and/or other NBA/WNBA/D-League intellectual property assets unless such product or service has been licensed separately by NBAMV or one of its affiliates;

6.   Licensee shall not use the NBA Data in connection with any product or service that presents an animated game (or game element) depiction or a near-live play-by-play account, unless such product or service has been licensed separately by NBAMV or one of its affiliates, but Licensee is not precluded from the use of the NBA Data in the display of scores and statistics in the same form in which the NBA Data was provided to Licensee by STATS (i.e. a screen crawl or live box score); and

7.   Licensee shall not use the NBA Data in a manner that suggests or implies a relationship between NBAMV, the NBA, the WNBA, the D-League, any NBA, WNBA or D-League team, and/or NBA, WNBA or D-League player, on the one hand, and any person or entity, on the other, without the prior written approval of NBAMV.

## EXHIBIT B-3
### MLB Data Terms & Conditions

With respect to the Major League Baseball-related data portions of the Licensed Materials ("**MLBAM Data**") licensed under this Agreement, Licensee agrees to comply with the following additional Terms and Conditions:

1. For purposes of these MLB Data Terms & Conditions, the following additional definitions shall apply:

**MLBAM**: shall mean MLB Advanced Media, L.P.

**MLBAM Mark(s)**: shall mean the MLB.com logo and word mark.

**MLB Entity(ies)**: shall mean the Office of the Commissioner of Baseball, its Bureaus, Committees, Subcommittees and Councils, MLBAM, SportsOnEarth, LLC, Tickets.com, Inc., Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc. (doing business in its own name and as Major League Baseball Productions), the Major League Baseball Clubs, and each of their subsidiaries or affiliated entities, any entity which, now or in the future, controls, is controlled by, or is under common control with the Major League Baseball Clubs or the Office of the Commissioner of Baseball, and the directors, officers and employees of the above entities.

2. The MLBAM Data and the MLBAM Marks shall not be used on any screen or page or in combination with any other content, if such page/screen/content includes content that has, contains, or concerns the following: (a) pornography or adult-oriented content; (b) lotteries or gambling, including any content (or link to any content) with the primary purpose of assisting an end user in betting on professional or amateur sporting events or accomplishments, or any feature (or link to any feature) which permits an end user to place a bet on any amateur or professional sporting event or accomplishment (for purposes of this provision, the publication of a "point spread" or "sporting event odds" or similar item shall not be prohibited content as long as such publication is not the primary content on the page where the MLBAM Data or MLBAM Marks also may appear); (c) obscene language or content, violence, discrimination, or promotion of illegal activities; (d) content that denigrates, disparages or reflects negatively on the MLB Entities, their owners and employees or the game of baseball (except genuine news content); (v) content in violation of intellectual property rights or laws; (e) libelous, defamatory or disparaging materials; (vii) contests or sweepstakes without the prior approval of MLBAM; or (f) content that (1) suggests an unauthorized sponsorship, endorsement, affiliation or other association with any MLB Entity or any MLB Entity employee, or (2) dilutes, infringes upon or otherwise violates the trademark, copyright or any other intellectual property or proprietary right of any MLB Entity.

3. The MLBAM Data and the MLBAM Marks shall not be used in any way that (a) advertises, promotes or expresses or implies endorsement of Licensee or any third party, cause, belief, product or service by any MLB Entity or its respective general or limited partners, members, shareholders, directors, officers, employees, agents or representatives; (b) induces the purchase or use of the products or services of Licensee or for any other promotional or commercial purpose without MLBAM's separate written agreement and the payment of a separate fee to be agreed upon by MLBAM and Licensee; or (c) reflects adversely on the reputation of any individual named in the MLBAM Data or any MLB Entity or its respective general or limited partners, members, shareholders, directors, officers, employees, agents

or representatives, provided that Licensee shall not be limited with respect to editorial or opinion content.

4.   STATS shall have the right to cease delivery of the MLBAM Data in the event that Licensee violates any provision set forth in Paragraph 2 of this Exhibit or any intellectual property rights of MLBAM with respect to the MLBAM Data, if such breach is not cured by Licensee within three (3) business days after notice from STATS.

5.   Subject to any space or other platform or technological restrictions, Licensee shall display the following attribution, (a) where the Minor League Baseball data portion of the MLBAM Data is used: "MiLB stats provided by MLB.com.  All rights reserved" and (b) where the Major League Baseball data portion of the MLBAM Data is used:  "MLB stats provided by MLB.com.  All rights reserved." STATS shall have the right to cease delivery of the MLBAM Data in the event that Licensee fails to display such attribution in connection with the MLBAM Data and fails to cure such omission within seven (7) days of written notice from STATS.   Licensee shall be entitled to display the MLBAM Marks in connection with the MLBAM Data.

EXHIBIT C



Note:
Color is an integral part of these logos. STATS will make available electronic files of the logos
with the proper colors.

**EXHIBIT D**
**SERVICE LEVEL AGREEMENT**

This Service Level Agreement (the "SLA") sets forth the support obligations for the in-game data feeds to be delivered by STATS to Licensee as set forth in the Agreement (the "Service").

1. **Definitions**. In addition to the capitalized terms defined elsewhere in this Schedule, the following terms shall have the meanings ascribed to them below:

(a) "Correction" means a modification or addition that, when made in response to an Error, establishes material conformity to the definition of the Service as set forth in the Agreement.

(b) "Error" means the failure of any portion of the Service to substantially perform in accordance with the Agreement or any reproducible defect in a feature or function of the Service that results in data loss, data corruption, abnormal termination of a program (i.e., a crash, quit, exit or other similar phenomenon), an infinite loop or "hang," and arithmetic or logic error or similar manifest malfunction as a result of any action or omission or circumstance within STATS' control (which will include STATS' agents and subcontractors). For purposes of assigning priority to handling of calls received, all Errors shall be classified as one of the following:

  (i) "Class 1 Error" means any condition that precludes core operation of the Service due to suspected or actual Errors in the Service.
  (ii) "Class 2 Error" shall mean any condition that precludes one or more of the major functions of the Service from being performed due to suspected or actual Errors in the Service.
  (iii) "Class 3 Error" means any condition (1) that precludes one or more non-essential functions of the Service from being performed due to suspected or actual Errors in the Service, or (2) in which Licensee's technical support personnel need assistance or information regarding the use or operation of the Service.

(c) "Downtime" means any Error or variation in the format or delivery of the Service that affects the ability of Licensee to serve its users in a consistent manner with respect to the quantity, quality and timeliness of content.

(d) "Licensee Error" means a disposition of a service call whereby it was established that the Service was functioning as designed, but that failure of the Service was a result of a Licensee omission or failure.

(e) "Support" means telephone and remote diagnostic support to Licensee (not directly with end users) with regard to support on the operation and utilization of the Service and maintenance modifications, error corrections or bug fixes necessary to bring the Service into conformance with the Agreement.

(f) "Workaround" means shall mean a procedure or routine that, when observed in regular operation of the Service, eliminates, or mitigates the practical adverse effect of an Error in a commercially reasonable manner.

2. **General.** The Service shall be provided in a professional manner that is generally consistent with industry standards. STATS shall provide 24 hour a day, 365 days a year technical support for the Service (the "Support"). The Support provided by STATS shall be maintained at a level comparable to industry standards of content providers. Moreover, STATS covenants that the uptime and maintenance schedule, and the general standard of care given to the Service, shall in all material respects be at least on par with the service levels provided for the Service as operated under STATS' own brand, any affiliated brand or any third party.

3. **Outages Schedule.** The Service shall be fully functional, timely and accessible by Licensee at least 99.45% of the time or better with no unscheduled Downtime to exceed four (4) hours in any calendar month. Any Error which results in a failure of Service for more than four (4) hours for any calendar month will be a "Rebatable Failure" and Licensee will be entitled to Service Outage Credits in accordance with Section 10 below for any Rebatable Failure.

4. **Response Time.** STATS shall respond to Errors in the Service as soon as such Error or outage is detected by or reported to STATS, but in no event any later than the Response Time set forth in Section 6 below.

5. **Designated Account Manager.** In addition to on-call Customer Service, STATS shall designate one person as primary contact for technical matters during normal business hours relating to this Agreement i.e. the period 9:00 a.m. through 6:00 p.m. Eastern Time, Monday through Friday. Licensee and STATS will exchange contact information for their respective 7x24 Network Operations Centers (each, a "NOC").

6. **Escalation Procedures.** STATS shall provide Licensee with a Workaround or Correction for Errors in accordance with the timelines in the following table:

| Types of Error | Response Time | Fix Time |
|---|---|---|
| Class 1 Error or Emergency Call | As soon as possible, but in any event, not longer than 15 minutes from notification by Licensee | Use all commercially reasonable efforts to resolve within 30 minutes |
| Class 2 Error | 30 minutes from notification by Licensee | Use all commercially reasonable efforts to resolve within 2 hours |
| Class 3 Error | 1 hour from notification by Licensee | Use all commercially reasonable efforts to resolve within 24 hours |

STATS will provide Licensee with a list of contact names and numbers to inform in the event of its detection of an Error. In the event that it detects an Error, STATS shall notify Licensee via an e-mail distribution list to include the Licensee NOC and Developer On Call ("DOC") addresses detailing the nature of the Error. If STATS' e-mail capabilities are compromised, STATS shall contact Licensee via telephone at its operation center.

License Agreement
Confidential
/#280957 v1

Page 32 of 34

Licensee's Initials

7.  **Service Level Reports**. STATS and Licensee will jointly report all Errors in the Service to the other (via the Licensee NOC and DOC) upon detection of the Error. STATS and Licensee will jointly provide a monthly report of all Downtime in the Service, including both scheduled and unscheduled Downtime in a mutually agreed upon format (the "Monthly Service Level Report").

8.  **Planned Maintenance**. STATS may take down the Service for scheduled maintenance from time-to-time. STATS shall notify Licensee NOC seventy-two (72) hours in advance of any scheduled maintenance that would require Licensee to suspend use of the Service. All maintenance shall occur in off-peak hours, between 3:00 a.m. and 6:00 a. m. Eastern Time, unless otherwise mutually agreed upon in advance in writing and signed by Licensee and STATS. Scheduled maintenance shall not exceed three (3) hours in any single thirty (30) day period.

9.  **Coding Changes**. STATS shall provide Licensee with at least thirty (30) days advance notice of any non-emergency changes to the format, content or delivery of the Service and provide complete and accurate documentation of the changes, including detailed specifications and sample data in machine-readable form sufficient to perform thorough tests of all relevant components fifteen (15) days in advance of the change in format, content or delivery of the Service.

10. **Service Outage Credits**. For each calendar month in which there is a Rebatable Failure, Licensee will receive credit for a portion of its License Fee based on the percentage of time STATS fails to meet the service level provisions of this Agreement per the schedule below. See example below for illustration of credit calculation. Such credit shall be applied against the next month's fees. Any credit towards the last month of the contract will be applied towards any subsequent contract.

| Service Level | Credit |
|---|---|
| 100% - 99.45% | 0% |
| 99.44% - 98.90% | 5% |
| 98.89% – 97.81% | 10% |
| 97.80% – 95.62% | 30% |
| 95.61% - 94.52% | 50% |
| 94.51% - 93.00% | 75% |
| Below 93.00% | 100% |

*Example* – if STATS' service level for the month is 98.36%, Licensee receives a 10% credit.

For purposes of the Service Outage Credits calculation, begin with a 720-hour, 30-day period. If STATS notifies Licensee of Planned Maintenance as per Section 8 herein, service outages shall not include any outages attributable to Planned Maintenance. For example, if Planned Maintenance in the above 30-day period was 8 hours and STATS also had 2 hours of unscheduled outages, STATS' Service Level for that 30-day period would be 99.73% and there would be no Service Outage Credit.

11. **Early Termination.** A Rebatable Failure which exceeds 24 hours in each of any three (3) consecutive months, or in each of any five (5) months in any twelve (12) month period shall constitute a material breach of this Agreement (a "Termination Failure"). If STATS breaches this Agreement via a Termination Failure, Licensee shall have the right, but not the obligation, to terminate the Agreement immediately upon notice to STATS. Such termination right must be exercised within seven days following the receipt of that month's Monthly Service Level Report with respect to the last month constituting the Termination Failure, as referenced above. If Licensee does not terminate the agreement within the seven (7) day period referenced in the preceding sentence, it waives its right to do so based upon Termination Failures for that month.

12. **Credits for Events of Force Majeure.** If an Event of Force Majeure is the failure of third party telecommunications facilities or any other event beyond the control of either party, the License Fee owed by Licensee for the month during which the Event of Force Majeure occurred will be reduced proportionately by the same percentage as the amount of Downtime that occurred as a result of the Event of Force Majeure during that calendar month. Downtime as a result of a Force Majeure Event will not be included in the calculation of a Rebatable Failure for purposes of determining a Termination Failure in Section 11 above.

# EXHIBIT 2

From: 1212 381 7201     Page: 1/1     Date: 4/2/2013 12:34:38 PM



*American City*
**BUSINESS JOURNALS**

120 West Morehead Street · Suite 400 · Charlotte NC  28202 · (704) 973-1000

**Whitney Shaw**
President and CEO

*Letter of Notification*

To:     **BY CERTIFIED MAIL**
        **and**
        **BY FAX: (847) 583-2650**
        Stats LLC
        2775 Shermer Road
        Northbrook, IL 60062
        Attn: Gary Walrath

        **COPY BY CERTIFIED MAIL**
        **and**
        **BY FAX (847) 583-2649**
        Stats LLC
        2775 Shermer Road
        Northbrook, IL 60062
        Attn: Legal Department

Date:    March 27, 2013

Ladies and Gentlemen:

American City Business Journals, Inc. **(ACBJ)** is contemplating the transfer of its Sporting News business division to a new joint venture, Perform Sporting News (2) LLC, a Delaware limited liability company **(New Company)** (the **Transfer**), which transaction is expected to close on or around March 27, 2013.  The New Company will be entirely owned by ACBJ and Perform Media Channels Limited, as the two partners in the joint venture.

Reference is made to that License Agreement, dated March 7, 2012, between STATS LLC, **(Stats)** and ACBJ d/b/a The Sporting News (the **Agreement**).  Pursuant to Section 18 of the Agreement, ACBJ hereby gives notice to STATS that, as part of the Transfer, ACBJ will assign its rights and obligations under the Agreement to the New Company.

Finally, ACBJ hereby notifies STATS that disclosure of the Transfer is considered confidential information and is prohibited by Section 11 of the Agreement.

Signed by:

for and on behalf of
**AMERICAN CITY BUSINESS JOURNALS, INC.**

295989

# EXHIBIT 3



**Sporting News Media**
A **PERFORM** GROUP COMPANY

120 W. Morehead Street
Charlotte, NC 28202

May 8, 2013

BY CERTIFIED MAIL and
BY FAX: (847) 583-2650
STATS LLC
2775 Shermer Road
Northbrook, IL 60062
Attn: Gary Walrath

COPY BY CERTIFIED MAIL and
BY FAX (847) 583-2649
STATS LLC
2775 Shermer Road
Northbrook, IL 60062
Attn: Legal Department

Re: Sporting News License Agreement

Dear Mr. Walrath:

As requested in your letter to us and American City Business Journals, dated May 1, 2013, I am writing to confirm to you that, in accordance with Section 18 of the License Agreement between STATS LLC and American City Business Journals, Inc. d/b/a The Sporting News (the "Agreement"), Sporting News Media (a/k/a Perform Sporting News (2) LLC), as assignee, hereby agrees to be bound by all of the terms and conditions of the Agreement.

Sincerely yours,

Juan Delgado
Chief Executive Officer

cc: Whitney R. Shaw

# EXHIBIT 4



470 Park Avenue South
New York, NY 10016
**t:** +1 (646) 918-8256
**e:** info@Sportingnews.com
**w:** www.sportingnews.com

June X, 2014

**By courier**
STATS LLC ("STATS")
2775 Shermer Road
Northbrook, IL 60062
Attn: Gary Walrath

      Re: Notice of termination of License Agreement between STATS LLC and Sporting News (2) LLC ("**Agreement**")

Dear Mr Walrath,

Pursuant to clause 3(b), Perform Sporting News (2) LLC ("**Perform**") hereby gives STATS thirty (30) days' written notice of termination of the Agreement.

As assignee of the rights, duties and privileges that American City Business Journals d/b/a The Sporting News originally enjoyed in respect of the Agreement, Perform has elected to exercise the right to terminate the Agreement which arose by virtue of the Change of Control event of which STATS was notified on 1 May 2013.

Enclosed is a cheque for the sum of $608,580, being the applicable Early Termination Fee (as defined in the Agreement).


Kind regards



Juan Delgado
Chief Executive Officer

A PERFORM GROUP COMPANY

# EXHIBIT 5



470 Park Avenue South
New York, NY 10016
t: +1 (646) 918-8256
e: info@Sportingnews.com
w: www.sportingnews.com

July 11, 2014

**By courier**
STATS LLC ("STATS")
2775 Shermer Road
Northbrook, IL 60062
Attn: Gary Walrath

Re: Notice of termination of License Agreement between STATS LLC and Perform Sporting
News (2) LLC ("**Agreement**")

Dear Mr Walrath,

We are in receipt of your letter dated 23 June 2014, in which STATS acknowledges the earlier
assignment of the Agreement to Perform Sporting News (2) LLC ("**Perform**").

Perform is indeed assignee of the rights, duties and privileges that American City Business Journals
d/b/a The Sporting News ("**ACBJSN**") originally enjoyed in respect of the Agreement, following the sale
of all or substantially all ACBJSN assets to Perform.

Perform has elected to exercise the right to terminate the Agreement which arose by virtue of the
Change of Control event which occurred between ACBJSN and Perform, and pursuant to clause 3(b),
Perform hereby gives STATS thirty (30) days' written notice of termination of the Agreement.

Enclosed is a cheque for the sum of $608,580, being the applicable Early Termination Fee (as defined
in the Agreement).

Kind regards

Juan Delgado
Chief Executive Officer
Perform Sporting News (2) LLC

# EXHIBIT 6



July 22, 2014

**VIA Overnight Mail**
Mr. Juan Delgado
Chief Executive Officer
Perform Sporting News (2) LLC
Sporting News Media
470 Park Avenue
New York City, New York 10016

RE:  Agreement dated March 7, 2012 between Perform Sporting News (2) LLC (as assignee of American City Business Journals Inc., d/b/a The Sporting News, a Delaware corporation) ("**Licensee**") and STATS LLC ("**STATS**") (the "Agreement").

Dear Mr. Delgado,

We have received your letter dated July 11, 2014  purporting to terminate the License Agreement (the "License Agreement") originally executed by American City Business Journals d/b/a The Sporting News, and subsequently assigned to Perform Sporting News (2) LLC ("Perform").  Please be advised that STATS, LLC ("STATS") hereby rejects Perform's invalid attempt to terminate the License Agreement based on a Change of Control (as that term is defined in the License Agreement) having allegedly occurred.  STATS will continue to perform its obligations under the License Agreement for the remainder of the term through December 31, 2016 and will expect Perform to do likewise.

If you have any questions regarding our position or your ongoing responsibilities under the License Agreement, please feel free to contact me.

Very truly yours,

STATS LLC

Gary Walrath
CEO

1007

**PERFORM SPORTING NEWS (1) LLC**

DATE 7/9/14

5-7017-2110

PAY TO THE
ORDER OF___STATS LLC_____ | $ 608,580.00

SIX HUNDRED AND EIGHT THOUSAND, FIVE HUNDRED AND EIGHTY ————————— DOLLARS

**✿ Citizens Bank•**

FOR___EARLY TERMINATION FEE_____

⑈"001007⑈" ⑈:211070175⑈: 1322715979⑈"